**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 08-227-C**

**NICOLE PENDLETON,**                                                          **PLAINTIFF,**

**V.**                      <u>**MEMORANDUM OPINION AND ORDER**</u>

**DELLA FASSETT, et al.,**                                              **DEFENDANTS.**

* * * * * * * * * * *

This matter is before the court upon the plaintiff's motion for summary

judgment (R. 42); the motion for summary judgment by defendants Hardin County

Board of Education, Joe Welch, and Della Fassett (R. 47); and the motion for

summary judgment by defendants City of Vine Grove, C.J. Fisher, and Dale Riggs

(R. 51).  The court will deny the plaintiff's motion; grant the motion of defendants

Hardin County Board of Education, Welch, and Fassett; and grant in part and deny

in part the motion of the City of Vine Grove, Fisher, and Riggs.

**I.     BACKGROUND**

In the fall of 2007, the plaintiff, Nicole Pendleton,[1] was a student at Brown

Street Alternative Education Center.  Brown Street is an alternative school in the

Hardin County School District.  Pendleton had attended Central Hardin County High

_____

[1]Pendleton was a minor when this lawsuit was filed but has since reached
the age of majority.  The parties refer to her by her full name and the court will do
likewise.

School but transferred to Brown Street after one year at Central.  She was a "voluntary student" at Brown Street; while some students attended the school because of disciplinary problems at the traditional schools in the district, Pendleton attended of her own accord as part of the "credit recovery program."

At the time of the incident at issue, defendant Lonnie Dale Riggs was a captain in the City of Vine Grove police department.  On September 11, 2007, [2] Riggs and four or five police officers, including defendant C.J. Fisher,[3] went to the school to conduct a search of the students at Brown Street.  Because of some delay, the officers arrived after most students were already inside and dispersed. One final busload of students was yet to arrive, and Riggs decided that the officers would search only those students.

Nicole Pendleton was on that bus.  After she entered the school, she was searched by Fisher, who was assisted by an employee of the school.  Both Fisher and the assisting employee were female, as is the plaintiff.  Pendleton asserts that the employee was Della Fassett; Fassett denies that she participated in or even was present for the search of Pendleton.

The parties disagree as to the reason for the search.  In his deposition, Riggs testified that he conducted the search because of a complaint from a teacher of

---

[2] Although the complaint dates the search as having taken place on September 13, 2007, the parties now agree that the actual date of the incident was September 11, 2007.

[3] At the time of the incident, Fisher used the last name Whelan.

2

marijuana smoke emanating from a school restroom.  He stated that he received this complaint from at least one teacher, maybe two, but he did not remember the name or gender of either teacher and had made no record of the complaint at the time.  Officer Fisher confirmed that the officers conducted the search because a staff member of Brown School had requested the search "because they had . . . heard that some of the students were bringing in cigarettes and marijuana cigarettes."  R. 51, Deposition of Fisher, exhibit E, p. 21, lines 7-9.  Fisher further explained that "[Riggs] stated that, um, the staff member stated that the girls are starting to bring in cigarettes and marijuana cigarettes in their bras and their socks and possibly their underwear." *Id.*, p. 25, lines 1-4; see also *id.* p. 46, line 18-20 (same).  The plaintiff disputes this version of the facts, pointing to the testimony of other witnesses.

Welch, the principal, testified in his deposition that he did not know why the search was performed.  R. 51, Deposition of Joe Welch, exhibit A, p. 44, lines 17-20.  Eric Vowels, Director of Alternative Programs, testified that he remembers asking Riggs why the search was performed and although he did not remember the specifics of Riggs's answer, he did not recall Riggs's mentioning the search was for marijuana and did recall being told the search was for cigarettes, lighters, and cell phones.  R. 51, Deposition of Eric Vowels, exhibit B, p. 39, lines 1-3; p. 42-43, lines 20-25; 1-6.

The scope of the search is also in dispute.  In her deposition, Pendleton

3

describes the search and states that Fisher asked her to lift her shirt and her

brassiere, which she did, exposing her breasts.  According to Pendleton, Officer

Fisher touched her chest beneath her breasts.[4]  Officer Fisher describes the search

differently.  She states that she asked Pendleton to untuck her shirt and lift her bra

away from her chest and shake it so that anything tucked in the bra would fall out.

According to Fisher, she reached around Pendleton from the back and, over

---

[4]Pendleton offers this account of the search:

"And the police officer, C.J., had asked me to take off my shoes.  And I took
them off and sat them on a table.  And she told me to spread my arms out
open like this.  And I had.  And she had ran her arms over my shoulders and
over my arms and underneath my arms and had, um, done both arms.  And
then she asked me to pull up my shirt and bra – untuck my shirt and pull up
my shirt and bra.  And I had, and I pulled it all the way up.  And, um, she
went underneath my breast and underneath my armpits, and she was moving
from side – from right to left.  And she went underneath my bra strap and
she had, uh, gone completely around.

And then she told me, 'okay, now unbuckle your pants and unbutton your –
uh, unbuckle your belt and unbutton your pants.'  And, um, I did.  And they
were still hanging there, they didn't drop or nothing.  And she had run her
hand, her fingers but not her thumb, through my waistline, and I had worn –
worn pretty short bikini-like underwear that day, so whenever she did she ran
her fingers like about my underwear line and all the way from right to left
kind of.

And um, after that she told me, 'okay, you can – we're done.'  And the she
said, 'no, wait, we got to check your shoes,' And then Miss Fassett – at the
time Miss Fassett was on her knees at my feet rubbing – or running her
hands through my pants, checking pant line and my socks and making sure I
didn't have anything on me, on my legs, I guess.  And Miss Fassett grabbed
the shoes and checked the shoes real quick and she let me put my shoes on
and I tucked in my shirt and I was done."

R. 51, Deposition of Pendleton, exhibit C, p. 54-55.

4

Pendleton's shirt, used her thumbs to search the area along the underwire of

Pendleton's bra.[5]  Pendleton and Fisher agree that Fisher also ran her fingertips

along the inside of the waistband of Pendleton's pants.  Only Pendleton and Fisher

testified as to exactly how Fisher conducted the search.

    Pendleton brings this action pursuant to 42 U.S.C. §1983, alleging violations

---

[5]Officer Fisher did not remember searching Pendleton.  She did recall the general procedure she used that day:
    Q: Okay.  Tell me what you did.  Tell me exactly how you conducted [the search] for these 7 or 8 students?
    A: When they come into the room I greet them, say morning.  I ask them take off their shoes, remove their shoes, and put them on the table.  Then they stand over and I ask them to pull out their shirt.  I said just untuck your shirt.  And I said what I need you to do is lean forward and pull your bra out and just shake it.
    Q: Okay.  Now where is the shirt?
    A: Still on.
    Q: Okay.  It is down around their waist or is it up around their breasts?
    A: No. No. I just have them untuck their shirt and it stays down.  And then I have them shake.  They grab the middle of the bra and they shake it.  That way, if the shirt's untucked, something comes out, it's down there.  Well they're standing there, their back is to me.  And I tell them, I lean around to them, and I tell them, I said I'm going to take the back of my hands, go between your breasts, and I said my thumb is going to go along your wire, if – you know, if they have a wire there.  And that's how I feel if there's anything under there.  I go – it's easier if I do on somebody – I go back-handed, and I go through, and my thumb is actually on the bottom part of the bra.  And then I continue on to the back.  Their shirt is on, it's on the outside of the clothing.
    Q: You mean your hands are on the outside of the shirt?
    A: My hands are on the outside of the shirt.
    Q: Okay.
    A: And the – my thumb is all that's touching under there.  Every once in a while I may take my 2 fingers, because there's a pocket in the side of a bra.  And that's where they were taking it in.  I would pinch right under here to see if there was anything in there.  But that was under the arm.

R. 51, Deposition of Fisher, exhibit E, p. 58-59.

of the Fourth and Fourteenth Amendments to the U.S. Constitution.[6]  She also brings a variety of state-law tort claims.  She names the following as defendants: Della Fassett, individually and in her official capacity as an employee of the Hardin County Board of Education; Joe Welch, individually and in his official capacity as the Principal of Brown Street School and an employee of the Hardin County Board of Education; the Hardin County Board of Education; C.J. Fisher, individually and in her official capacity as a police officer and employee of the City of Vine Grove Police Department; Dale Riggs, individually and in his official capacity as the captain of the City of Vine Grove Police Department; and the City of Vine Grove, Kentucky.

Pendleton requests that the court enter summary judgment in her favor on the issue of liability.  Fassett, Welch, and Hardin Country Board of Education ("BOE defendants") request summary judgment in their favor on all claims; Fisher, Riggs, and the City of Vine Grove ("City defendants") request likewise.

## II.  ANALYSIS

---

[6]In her complaint, the plaintiff alleges generally that "[t]his action arises under the United States Constitution, particularly under the provisions of the 1st, 4th, 6th, and 14th Amendments. . . ." R. 29, Complaint, ¶ 8.  The plaintiff filed an amended complaint, which states that it incorporates the Complaint.  R. 29, Amended Complaint, ¶ 1.  The Amended Complaint alleges that Welch and Riggs violated the 4th and 14th Amendments.  R. 29, count 1, ¶ 8; count II, ¶ 11.  No party addresses any claim made under the first and sixth amendments, and to the extent the plaintiff alleges such claims, the court will enter judgment for the defendants on those claims.  The plaintiff has presented no facts that would support a finding that the rights secured by those amendments were violated.

A.     **Section 1983 Claims**

1.     Section 1983 Claims against Fassett, Welch, Fisher, and Riggs in their
       Individual Capacities: Defendants Entitled to Qualified Immunity

The defendants argue that they are entitled to qualified immunity as to the

plaintiff's § 1983 claims.[7]  Because the plaintiff has not demonstrated that the

defendants violated a clearly established constitutional right, the court will grant the

defendants qualified immunity.

The doctrine of qualified immunity provides that "government officials

performing discretionary functions generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald* , 457 U.S. 800, 818 (1982).   The plaintiff bears the burden of proving

that the officers are not protected by qualified immunity.  *Livermore ex rel. Rohm v.*

*Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

---

[7]Defendants Fisher and Riggs argue that the plaintiff has no valid claim
against them in their individual capacities because she "has not alleged any
tortuous [sic] conduct independent of the police officers' positions with the [Vine
Grove Police Department] and has expressly alleged that all actions taken by these
individual Defendants was [sic] done in the course and scope of their employment
with the VGPD." R. 51, p. 28.  This argument is without merit.  A public official
may be held personally liable for actions taken "on the job," pursuant to his official
authority. *See Hafer v. Melo*, 502 U.S. 21, 27-28 (1991) (rejecting argument that
"state officials may not be held liable in their personal capacity for actions they take
in their official capacity"); *Chaudhuri v. State of Tennessee*, 767 F.Supp. 860, 864-
65 (M.D. Tenn. 1991).  Defendant City of Vine Grove also argues it is entitled to
qualified immunity for the claims against the officers in their official capacities.
However, qualified immunity is a doctrine that applies only to protect officers sued
in their individual capacities.  To the extent City of Vine Grove has made this
argument, the argument fails.

7

When a court determines whether a defendant is entitled to qualified immunity, there are two steps to its analysis.[8]  *See Saucier v. Katz* , 533 U.S. 194, 201 (2001).   First, the court must ask "whether [the] evidence produced by the plaintiff, taken in the light most favorable to the plaintiff but viewed from the perspective of a reasonable officer [or school official] on the scene, establishes a claim of [a] violation of the Constitution."  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).   "If plaintiff's evidence does not establish [a] . . . violation, summary judgment is granted in favor of defendants."  *Id.*   Second, if the court finds that plaintiff's evidence does establish a constitutional violation, the plaintiff "must . . . demonstrate . . . that the constitutional right was clearly established at

---

[8]The Sixth Circuit uses both a two-step and a three-step analysis of qualified immunity claims.  *See Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 301 (6th Cir. 2005) (deciding to use only two steps as set forth in *Saucier*)); *Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005) (explaining that the third step is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights" (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2006)).  "[B]oth the two-step approach and the three-step approach can be said to capture the holding of *Saucier v. Katz*, 533 U.S. 194 (2001). [. . . .] [I]n many factual contexts, . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable.'"  *Causey*, 442 F.3d at 528 n.2.  This court finds that using a two-step inquiry is appropriate to resolve the instant motion.  *See generally* 1A Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses §9A.04[C], at 9A-53 (4th ed. 2006 & Supp. 2007) ("Although the [Supreme] Court has consistently defined qualified immunity in terms of the objective reasonableness of the officer's conduct, it has defined objective reasonableness in terms of whether, under the particular circumstances, the official's conduct violated clearly established federal law.  In other words, an officer who violated clearly established federal law did not act in an objectively reasonable manner.").

the time of the incident." *Id.*[9]

a.    *The plaintiff has established that the search violated her Fourth
      Amendment right to be free from unreasonable searches.*

Taking the plaintiff's evidence in the light most favorable to her, the court

concludes that the plaintiff has produced evidence that supports her claim that

Fisher and Fassett violated her constitutional right to be free from an unreasonable

search.

The Fourth Amendment protects individuals from "unreasonable searches

and seizures." U.S. CONST. amend. IV.  Generally, in order to conduct a search, an

officer must have probable cause to believe an individual is engaged in illegal

activity and that "evidence bearing on that offense will be found in the place to be

searched." *Safford Unified School Dist. No. 1 v. Redding*, — U.S. ----, 129 S. Ct.

2633, 2639 (2009).  In a school setting, however, the level of suspicion required

to justify a search is less than probable cause.  *See New Jersey v. T.L.O.*, 469 U.S.

325, 341 (1985) (concluding that "the accommodation of the privacy interests of

schoolchildren with the substantial need of teachers and administrators for freedom

to maintain order in the schools does not require strict adherence to the

---

[9] It is no longer mandatory that the district court conduct the two-step test
of *Saucier* in the order described here.  *See Pearson v. Callahan*, — U.S. ----, 129 S.
Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we
conclude that, while the sequence set forth there is often appropriate, it should no
longer be regarded as mandatory.").  The district court now has the discretion to
move directly to the second prong of the test.  *See id.*  Here, the court, in its
discretion, finds it appropriate to use the *Saucier* two-step test.

requirement that searches be based on probable cause").  "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.*

"Determining the reasonableness of a school search involves a twofold inquiry: first, was the action justified at its inception; and second, was the search reasonably related in scope to the circumstances justifying the search." *Beard v. Whitmore Lake School District*, 402 F.3d 598, 603-04 (6th Cir. 2005) (citing *T.L.O.*, 469 U.S. at 341).  The standard is the same for all school searches, including those done by police officers.  *See Johnson v. City of Lincoln Park*, 434 F.Supp. 2d 467, 475-76 (E.D. Mich. 2006) (noting that "the Sixth Circuit and other courts that have considered this issue have found that the *T.L.O.* standard is the appropriate standard to apply to school searches done by police officers, as well as school officials" (citations omitted)).

"In general, 'a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Beard*, 402 F.3d at 604 (quoting *T.L.O.* 469 U.S. at 342).

Taking the plaintiff's version of the facts as true, the search was undertaken in order to uncover possession of items brought into the school in violation of school rules, such as cigarettes, cigarette lighters, and cell phones.

10

The court will assume, without holding, that the search was justified at its inception. *See Brannum v. Overton County School Bd.*, 516 F.3d 489, 496 (6th Cir. 2008) (observing that the school policy of using video surveillance equipment was "instituted for the sake of increasing security, which is an appropriate and common sense approach and not one subject to our judicial veto" but that "the scope and manner in which the video surveillance was conducted is subject to Fourth Amendment limitations, and therefore, appropriate for our inquiry"); *Beard*, 402 F.3d at 604 (assuming without holding that search justified as "some search of the persons and effects of students may be warranted when substantial property has been reported recently stolen").

A school search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Redding*, 129 S.Ct. at 2639 (quoting *T.L.O.*, 469 U.S. at 342).  In a school setting, it is not always necessary that the reasonable suspicion be individualized; that is, school officials may conduct searches of multiple students without a suspicion that a particular student has committed an infraction.  *See Bd. of Educ. of Indep. School Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822 (2002); *Vernonia School Dist. v. Acton*, 515 U.S. 646 (1995); *Beard*, 402 F.3d at 604.  To evaluate whether a search of a student without individualized suspicion is nonetheless permissible, the court considers the three factors articulated by the *Vernonia* court:

11

(1) the legitimacy of the student's expectation of privacy; (2) the character of the intrusion complained of; and (3) the nature and immediacy of the governmental concern at issue and the efficacy of the means chosen for meeting it.  *Vernonia*, 515 U.S. at 654-64; *Beard*, 402 F.3d at 604.

"[G]enerally, students have a less robust expectation of privacy than is afforded the general population."  *Brannum*, 516 F.3d at 496 (citing *T.L.O.*, 469 U.S. at 348 (Powell, J., concurring)).  Students at Brown Street were "wanded" each day upon entering the school.  However, Pendleton nevertheless retained "a significant privacy interest in [her] unclothed bod[y]."  *Beard*, 402 F.3d at 604.  *Cf. Hill v. Sharber*, 544 F.Supp.2d 670 (M.D. Tenn. 2008) (finding student retained no legitimate expectation of privacy in contents of car parked on school lot with school-issued permit).  The plaintiff testified in her deposition that Fisher asked her to lift her shirt and bra, revealing her breasts.  While her entire body was not fully unclothed, she was partially unclothed from the waist up, at least briefly.  She certainly had a legitimate expectation of privacy in her partially unclothed body.  *See Brannum*, 516 F.3d at 495 (noting that the difference between one's privacy interest in one's naked body and in one's underwear-clad body is a difference "of degree, rather than of kind").

Second, the character of the intrusion, as described by the plaintiff, was invasive.  According to the plaintiff, Fisher touched her underneath her breasts and went completely around her body, underneath the bra.  *See* R. 51, Deposition of

Pendleton, exhibit C, pp. 71-74.  As stated above, the plaintiff also testified that Fisher requested that she lift her shirt and bra, exposing her breasts.  Furthermore, the plaintiff stated that Fisher put her hand in her pants, all the way up to the thumb, so that her fingers reached as far down as the top of the plaintiff's low-cut underwear.  The search therefore involved a significant amount of bodily contact.  This was not a search that was limited to visual inspection.  By Fisher's own admission, she used her fingers to probe the underwire of the plaintiff's bra and admits using two fingers to feel the inside of the plaintiff's waistband.  Clearly, the search involved a significant intrusion into the plaintiff's personal space.  In addition, at least one court has determined that a search such as this one was "qualitatively more severe than that in *Vernonia* and *Earls*" because the possibility existed that the police would bring criminal charges against Pendleton as a result of items found during the search. *Doe ex rel. Doe v. Little Rock School District*, 380 F.3d 349, 355 (8th Cir. 2004).  Although no other students witnessed the search, as in *Beard*, the character of the search remains quite invasive.  *Cf. Vernonia*, 515 U.S. at 658 (finding urine drug test was minimally invasive, where male students fully clothed and observed from behind and female students produced sample in stall with female monitor outside stall, conditions "nearly identical to those typically encountered in public restrooms").

Third, the court looks to the "governmental concern at issue" and the "efficacy of the means chosen."  Here, the governmental interest was maintaining

order. This governmental interest is significant. *See Beard*, 402 F.3d at 604 (noting that "school administrators have a real interest in maintaining an atmosphere free of theft" although even greater interest in ensuring school free from drugs and weapons). The general governmental interest in safe and disciplined schools in order to promote and ensure a productive learning environment is even more weighty here, as the school is an alternative education center, serving students removed from the district's traditional schools due to disciplinary problems.[10]

However, the complete lack of any reasonable belief that Pendleton – *or any other student on her bus* – possessed any contraband detracts from the generally compelling nature of the government interest. The government's interest is "diluted" when a school searches a group of students "without reason to suspect that any particular student was responsible for the alleged" infraction. *Beard*, 402 F.3d at 605. This is so because without any individualized suspicion, "the intrusive search of each individual is that much less likely to be successful." *Id.* In *Beard*, school officials searched all twenty-five students in a gym class when one student in the class reported that her money had been stolen during class. *Beard*, 402, F.3d at 601-02. Here, however, there was an even smaller likelihood that any student would possess contraband. The defendants had no reason to believe this

---

[10]Pendleton points out she was not attending Brown Street due to disciplinary problems. It is clear from the deposition testimony of multiple witnesses, however, that most students were at Brown Street due to disciplinary problems.

particular group of students may have been breaking the rules.  Unlike in *Beard*, where the school officials had reason to believe one of the twenty-five students had stolen the money, here the defendants decided to search this group of students because it was the only bus that had not yet arrived when the police officers got to the school that day.  Furthermore, the plaintiff has established that there was scant reason for the officials to even believe that a school rule had been broken.  Even under the more favorable facts presented by the defendants' witnesses, the search was based on a report from a previous day that some student or students were smoking marijuana in a bathroom.  A search of a random group of forty to sixty students the next day (or two days later) is not an effective method of uncovering a perpetrator of that alleged offense.

Based on the plaintiff's presentation of facts, the court concludes that the search was unreasonable due to the intrusive nature of the search, the possibility of criminal charges as a result of the search, the fact that the search was undertaken to find items violative of school rules but not otherwise dangerous, and the minimal likelihood that the search would uncover contraband on Pendleton's person.  Accordingly, the plaintiff produced evidence establishing that she suffered a violation of her Fourth Amendment rights.

> b. *The plaintiff has not demonstrated that the defendants violated a clearly established constitutional right.*

The plaintiff has not demonstrated that the defendants violated a clearly

established constitutional right.  "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 129 S. Ct. at 822 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  In order to determine whether an officer violated clearly established law, the court considers "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotation marks omitted)).

"A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred." *Durham v. Nu'man*, 97 F.3d 862, 866 (6th Cir. 1996) (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).  This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Beard*, 402 F.3d at 606 (quoting *Brosseau v. Haugen*, 543 U.S. 184 (2004) (quoting *Saucier*, 533 US at 201))).

"In order for the law to be clearly established as of the date of the incident, the law must 'truly compel (not just suggest or allow or raise a question about), the conclusion . . . that what the defendant is doing violates federal law *in the circumstances*.'" *Beard*, 402 F.3d at 607 (quoting *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515-16 (6th Cir. 1997) (quoting *Lassiter v. Ala. A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994))).  "Accordingly, cases 'cast at a high level

16

of generality,' will only be sufficient to clearly establish the unlawfulness of a defendant's actions where the conduct at issue is 'obviously' a violation based on the prior cases." *Id.*  Thus, the law may "truly compel" the conclusion that the officer's actions constitute a violation when the factual scenario is an obvious or egregious violation, whose unconstitutionality is clear even with only basic guidance from the courts.  *See Redding*, 129 S.Ct. at 2643 ("The unconstitutionality of outrageous conduct obviously will be unconstitutional . . . ." (citing *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990)).  Alternatively, the law may "truly compel" the conclusion when a prior case was similar enough to give the parties fair warning that their actions were unconstitutional.  *Beard*, 402 F.3d at 607; *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that officials can be on notice that conduct violates established law in "novel factual circumstances" so long as the state of the law gave them "fair warning" that conduct was unconstitutional).

First, the court finds that the alleged violation in the instant case is not sufficiently "outrageous" to render it an "obvious case."  *See Beard*, 402 F.3d at 607 (concluding no "obvious" violation where students made to strip to underwear in search for stolen money). *Cf. Brannum v. Overton County School Bd.*, 516 F.3d 489, 499 (holding that "surreptitiously" videotaping middle-school students while they changed clothes in locker room violated clearly established law in part because "a person of ordinary common sense, to say nothing of professional school administrators, would know without need for specific instruction from a federal

17

court, that teenagers have an inherent personal dignity, a sense of decency and

self-respect, and a sensitivity about their bodily privacy that are at the core of their

personal liberty and that are grossly offended by their being surreptitiously

videotaped while changing their clothes in a school locker room").

Next, the court finds that the officials involved did not have fair warning that

their alleged conduct was unconstitutional.  The Supreme Court issued two on-

point cases prior to 2007, *T.L.O.* and *Vernonia*.  The facts of neither are

sufficiently similar to this case to provide any specific guidance; and the "basic

principles of law relating to school searches," which the cases set forth, "do not

offer the guidance necessary to conclude that the officials here were, or should

have been, on notice that the search[] performed in this case [was] unreasonable."

*Beard*, 402 F.3d at 607.

"*T.L.O.* is useful in 'guiding [the court] in determining the law in many

different kinds of circumstances'; but [it] is not 'the kind of clear law' necessary to

have clearly established the unlawfulness of the defendants' actions in this case."

*Beard*, 402 F.3d at 607 (citing *Brousseau*, 125 S. Ct. at 599 (quoting *Pace v.*

*Capobianco*, 283 F.3d 1275, 1283 (11th Cir. 2002))); *see also Redding*, 129 S.

Ct. at 2643 (noting that "lower courts have reached divergent conclusions

regarding how the *T.L.O.* standard applies to [student] searches" and concluding

that this lack of uniformity was "substantial enough to require immunity"); *Williams*

*v. Ellington*, 936 F.2d 881, 886 (6th Cir. 1991) (observing that "the

reasonableness standard articulated in *New Jersey v. T.L.O.* [] has left courts later

18

confronted with the issue either reluctant or unable to define what type of official conduct would be subject to a 42 U.S.C. § 1983 cause of action"). Nor does *Vernonia* "compel" the conclusion that the defendants' actions were unconstitutional. *See Beard*, 402 F.3d at 608 ("In *Vernonia*, the Court clarified the situation only to the extent that it found that some searches undertaken without individualized suspicion are reasonable.").

The relevant Sixth Circuit and Kentucky precedents do not clearly establish the unconstitutionality of this search. The court first looks to the guidance provided by *Beard v. Whitmore Lake School Dist.*, 402 F.3d 598 (6th Cir. 2005).[11] In *Beard*, school officials searched a group of twenty students, some boys and some girls, because a student had reported money stolen. *Beard*, 402 F.3d at 601-02. While the boys were searched one at a time, the girls were searched all

_____

[11]The plaintiff does not discuss *Beard*. In addition to *T.L.O.* and *Vernonia*, she cites three cases to demonstrate that these defendants violated clearly established law. The first, *Brannum v. Overton County School Bd.*, 516 F.3d 489 (6th Cir. 2008), was decided in 2008 after the search here had taken place. The second, *Redding v. Safford Unified School District #1*, 31 F.3d 1071 (9th Cir. 2008), is both from outside this circuit and decided after the search of Pendleton. The third, *Doe v. Renfrow*, 631 F.2d 91 (7th Cir. 1980), was decided prior to the search but is also from a federal court outside this circuit. "In the 'rare instance' where it is proper to seek guidance from outside this circuit, the law will only be clearly established where the cases from outside this circuit 'both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Beard*, 402 F.3d at 608 (quoting *Williams*, 936 F.2d at 885). *Doe*, decided prior to *T.L.O.* and *Vernonia*, is not such a case.

together, while standing in a circle. *Id.* The students were not touched. *Id.* However, elements of the searches of both the boys and the girls make those searches arguably more invasive than the search of Pendleton. The girls were made to lower their pants in addition to raising their shirts, and the court made clear that the presence of fellow classmates made the search more invasive. *Id.* at 606. The boys were searched individually but had to lower their underwear. *Id.* at 605. The court also emphasized that the searches were undertaken to find missing money, as a result of a single theft during gym class at a traditional school: a goal which is considerably different than the instant search, supposedly made in order to ensure discipline and order at an alternative school. The result in *Beard* thus does not "truly compel" the conclusion that the search of Pendleton was unconstitutional. Nor does any other Sixth Circuit case issued prior to 2007 compel such a conclusion. *See Reynolds v. City of Anchorage*, 379 F.3d 358 (6h Cir. 2004) (holding constitutional strip search of female student suspected of drug use living in group home); *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991) (holding constitutional strip search of student suspected of drug use).

One Kentucky case is relevant and warrants discussion. In *Lamb v. Holmes*, 162 S.W.3d 902 (Ky. 2005), the Kentucky Supreme Court relied on *Beard* to hold that searches of middle-school-aged female students to find a missing pair of shorts, where the students alleged they were made to raise shirts and lower pants, were unconstitutional because "(1) the searches were intrusive in nature; (2) the searches were conducted to find a missing pair of shorts, (3) a large number of

20

students were subject to the searches, (4) the searches lacked individualized suspicion, (5) the students did not consent to the searches, and (6) the searches were conducted in front of other students." *Lamb*, 162 S.W.3d at 907.

The searches found unconstitutional in *Beard* and *Lamb* were simultaneously more invasive (pants lowered, in front of other students, and younger students) and based on a far less compelling government interest (stolen money, a missing pair of shorts) than the instant alleged conduct. This plaintiff was seventeen years old, significantly older in age and maturity than the middle-school-aged students that were subjected to searches in the relevant case law. *See T.L.O.*, 469 U.S. at 342 (noting that age of student is relevant to determination of intrusiveness of the search). Furthermore, the plaintiff was a student at an alternative high school. *See Hough v. Shakopee Public Schools*, 608 F.Supp.2d 1087, 1111 (D. Minn. 2009) (granting individuals qualified immunity where daily searches of students at alternative school violated constitution where some support in case law for contention that alternative school special circumstances justified search policy (citing *C.N.H. v. Florida*, 927 So. 2d 1, 2 (Fla. Dist. Ct. App. 2006)). The available case law therefore did not give the instant officials "fair warning" that their conduct was unconstitutional.

Accordingly, Fisher, Welch, Fassett, and Riggs are protected from a civil damages suit for their allegedly unconstitutional conduct by the doctrine of qualified immunity. *See Reynolds v. City of Anchorage*, 379 F.3d 358, 367 (6th Cir. 2004) (granting qualified immunity to officers who performed strip-search on juvenile

21

living at group home for juvenile delinquents, where no case found that addressed that exact factual situation and the question of constitutionality of the search "close and difficult" and "involv[ing] subtle legal distinctions and inferences that a reasonable police officer would not and could not be expected to make"); *Richardson v. Board of Education of Jefferson County,* Kentucky, No. 04-CV-386, 2006 WL 2726777 (W.D. Ky. Sept. 22, 2006) (concluding officers entitled to qualified immunity where law did not compel conclusion that they violated students' fourth amendment rights); *Johnson v. City of Lincoln* Park, 434 F.Supp.2d 467 (E.D. Mich. 2006) (granting qualified immunity to officer searching student where no case decided by Supreme Court or Sixth Circuit with similar factual contexts "truly compelled" conclusion that officers acted illegally). *Cf. Foster v. Raspberry*, 2009 WL 235585 (M.D. Ga. July 29, 2009) (finding that Eleventh Circuit case law "[made] it clear that even if the non-dangerous contraband is not allowed on school grounds by express rule, school officials cannot search a student's underwear without individualized suspicion").[12]

---

[12]The plaintiff does not allege that either Welch or Riggs was personally involved in searching her. Presumably, the individual-capacity claims brought against these individuals under section 1983 are based on a theory of supervisory liability. Such a claim must be based on something more than *respondeat superior*; the plaintiff must show that the supervisors "somehow encouraged or condoned the actions of their inferiors." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). Failure to review the inferiors' work is insufficient to establish supervisory liability. *Id.* There must be a causal connection between the violation and the actions of the supervisor. *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002); *see also Ashcroft v. Iqbal*, — U.S. ----, 129 S. Ct. 1937, 1949 (2009) (observing that in section 1983 action, term "supervisory liability" is a "misnomer," as each individual can be liable only for own misconduct). "The

2.  <u>Section 1983 Claims against Fassett, Welch, Fisher, and Riggs in their
    Official Capacities and against Hardin County BOE and City of Vine Grove:
    Plaintiff Has Not Supported Claim that Entities Are Culpable in Alleged
    Constitutional Violation</u>

Both parties request summary judgment as to the section 1983 claims

brought against Fassett, Welch, Fisher, and Riggs in their official capacities.

Because the plaintiff has not demonstrated that the allegedly unconstitutional

search is linked to deliberate conduct on the part of either the Hardin BOE or the

City of Vine Grove, the court must deny the plaintiff's motion for summary

judgment and grant the defendants' motion as to these claims.

A claim against a state or municipal official in his or her official capacity is

equivalent to a claim against the entity itself.  *See Kentucky v. Graham*, 473 U.S.

159, 166 (1985).  Therefore, the claims against Fassett and Welch in their official

capacities state a claim against the Hardin County Board of Education; the claims

against Fisher and Riggs in their official capacities state a claim against the City of

Vine Grove.[13]

---

causal connection can be established when a history of widespread abuse puts the
responsible supervisor on notice of the need to correct the alleged deprivation, and
he fails to do so."  *Doe*, 296 F.3d at 440.  The parties have not addressed the
availability of qualified immunity to Welch and Riggs.  However, the court
concludes that if their inferiors are protected from liability by qualified immunity,
they too are entitled to such protection.

[13]City of Vine Grove is, of course, a municipality and therefore a local
government entity.  Hardin County Board of Education, likewise, is a local
government entity, and its liability under section 1983 is judged by the same
standard applied to municipalities.  *See, e.g.*, *M.W. ex rel. T.W. v. Madison County*

23

The liability of these local government entities cannot be based on a theory of vicarious liability or *respondeat superior*. *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658 (1978).  Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

The Sixth Circuit has enumerated "four avenues a plaintiff may take to prove the existence of a [local government entity's] illegal policy or custom": "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986); *Napier v. Madison County, Kentucky*, 238 F.3d 739, 743 (6th Cir. 2001) (noting plaintiff must "show that the unconstitutional policy or custom existed, that the policy or custom was connected to the [local government entity], and that the policy or custom caused [her] constitutional violation").

---

*Bd. of Educ.*, 262 F.Supp.2d 737, 743 (E.D. Ky. 2003) (noting that county board of education is local political subdivision and liability under section 1983 must be established under *Monell*).  The plaintiff does not argue otherwise.

For the purpose of analyzing the parties' motions as to the liability of Hardin County BOE and the City of Vine Grove, the court will assume that the search of Pendleton was unconstitutional.  To the extent that the plaintiff argues that she is entitled to summary judgment on these claims based on the first "avenue," that there was an official policy of unconstitutional searches, her argument fails.  The plaintiff does not allege that the written policy of the Hardin County Board of Education was the source of Pendleton's injury;[14] nor has she made any showing that the entities otherwise adopted a formal, unwritten policy of unconstitutional searches.

The plaintiff attempts to establish that the entities are liable because the allegedly unconstitutional search was the result of a policy or decision made by Welch and Riggs.  However, she has not made the necessary showing that either person had final decision-making authority as to searches of Brown Street School students undertaken as a part of the partnership between the school and the City of Vine Grove police department.  *See* R. 51, Deposition of Eric Vowels, exhibit B, p. 24-25, lines 7-25; 1-15 (testifying that neither he nor anyone on the board of

---

[14]At the time of the search, Hardin County Board of Education had the following policy on student searches:

Reasonable suspicion: No pupil's outer clothing, pockets, or his or her personal effects (e.g., handbags, backpacks, etc.) or vehicle shall be searched by authorized school personnel unless there are reasonable grounds to believe the search will reveal evidence that the pupil has violated or is violating either a school rule or the law.  Search of a pupil's person shall be conducted only with the express authority of the Principal or designee.

Strip Searches: No strip searches of students shall be permitted.

education knew about the searches and that someone at "the central office" should have known); R. 51, Deposition of Joe Welch, exhibit A, p. 11-13 (testifying that Hardin County BOE makes the policy for Brown Street although he would be one of the people who might address issues arising for which there was no written policy). Furthermore, the plaintiff does not make any legal argument as to why the school principal or a police department captain would have this final decision-making authority. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988) (court must consider state law to determine whether particular official has necessary final authority to establish entity policy).[15]

The third "avenue," deliberate indifference in training or supervision, also does not provide the plaintiff with a basis for holding the entities liable for the search. The plaintiff makes no argument that either Fisher or Fassett has a record of misconduct or was otherwise incompetent. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) (something more than single act of violating constitutional rights necessary to show city liable due to deliberate indifference or gross negligence in training).

The plaintiff seems to base her claims primarily on her argument that the entities are liable because there was a custom of unconstitutional searches. For the purposes of entity liability, a custom is defined as a "widespread practice that,

--------

[15]The plaintiff at times refers to Riggs as the Chief of the Vine Grove Police Department. Although he was chief for some period of time, he was not Chief in September of 2007. Steven Manning was. R. 51, Deposition of Riggs, exhibit D, p. 5, lines 10-21.

although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law." *Praprotnik,* 485 U.S. at 117 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  "An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see also Doe v. Claiborne County*, 103 F.3d 495, 507-08 (6th Cir. 1996) (describing "custom" for purposes of *Monell* liability as "so permanent and well-settled as to constitute a custom or usage with the force of law" and reasoning that as "law" included "[d]eeply embedded traditional ways of carrying out state policy," then "'custom' is a 'legal institution' not memorialized by written law").

In addition to identifying conduct attributable to the local government entity, the plaintiff must also connect that conduct to the violation of her constitutional rights.  The plaintiff "must demonstrate that 'through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 442  (6th Cir. 2000) (quoting *Bryan County v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 690-91)).

The testimony from their depositions demonstrates that Welch and Riggs had

27

an understanding that City of Vine Grove police officers had searched the Brown Street students on a regular basis, approximately twice a year for the previous five or six years.  *See, e.g.*, R. 51, Deposition of Riggs, exhibit D, p. 10, lines 4-9; R. 51, Deposition of Welch, exhibit A, p. 14-15, lines 3-25; 1-18.  Taking the evidence in the light most favorable to the plaintiff, at best she has established that Riggs was engaging in an unconstitutional practice.  *See* R. 51, Deposition of Fisher, exhibit E, p. 30, lines 10-14 (testifying that she always searched girls' waistbands and bras when they searched Brown Street students).  The plaintiff has presented substantial evidence that Riggs was searching the Brown Street students – with Welch's blessing.  The plaintiff argues that the participation of Riggs and Welch means that the searches were not undertaken by some "rogue" officials.  In truth, however, without showing that these two individuals had the authority to make policy for Brown Street school – not just that Riggs believed he had that authority – the plaintiff has demonstrated only that Riggs and Welch may have themselves been the "rogue" officials.

The plaintiff simply has not made any showing that the city or the school board was the "moving force" behind the practice of searching the students.  *See* R. 51, Deposition of Eric Vowels, exhibit B, p. 24-25, lines 7-25; 1-15 (testifying that neither he nor anyone on the board of education knew about the searches and that someone at "the central office" should have known); R. 51, Deposition of Joe Welch, exhibit A, p. 11-13 (testifying that Hardin County BOE makes the policy for Brown Street although he would be one of the people who might address issues

28

arising for which there was no written policy); R. 70, Deposition of Bobby Lewis, Associate Superintendent, p. 6-9  (testifying he was Vowels's superior in authority and had responsibility for Brown Street, had no knowledge of the searches, and should have been apprised of the practice); R. 71, Deposition of Steven Manning, Chief of Police, p. 24-25 (testifying he knew of specific search in September but did not know scope of search and would not have approved it).  To the contrary, the testimony of these individuals clearly demonstrates that no one other than Riggs and Welch knew of the practice; Welch's own testimony demonstrates that even he was unaware of the scope of the searches.  The plaintiff makes no argument of culpability based on official actions other than those taken by Welch and Riggs.[16]

The plaintiff has not made a showing that unconstitutional searches were a custom, so well-settled as to have the force of law.  And without such a showing, the plaintiff is essentially advocating that the actions of the individual defendants be attributed to their employers and the employers be held responsible based on the doctrine of vicarious liability – and, as discussed above, liability of a local government entity based on vicarious liability was prohibited by *Monell*.

To survive summary judgment, the non-movant must come forward with evidence on which the jury could reasonably find in her favor.  *Anderson v. Liberty*

---

[16]In fact, all of the school officials testified that they would have been concerned if they had known about the practice. *See, e.g.*, R. 70, Deposition of Lewis, p. 17-19.  Furthermore, the searches were a violation of the school board policy.

*Lobby, Inc* ., 477 U.S. 242, 252 (1986).  The non-movant must present more than a mere scintilla of evidence to defeat a motion for summary judgment.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989); Fed. R. Civ. P. 56(e). Rather, "[t]he inquiry on a summary judgment motion … is … 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" *Street*, 886 F.2d at 1479 (quoting *Anderson*, 477 U.S. at 251-52).  The court must view all of the evidence in the light most favorable to the party opposing summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In sum, even viewing the evidence in the light most favorable to the plaintiff, she has not come forward with any evidence on which a jury could base a finding that either the city or the BOE was culpable in the constitutional deprivation allegedly experienced by Pendleton.  Accordingly, the defendants are entitled to summary judgment on these claims.

**B.    State Tort Claims**

The plaintiff also asserts state-law claims for assault and battery, intentional infliction of emotional distress,[17] negligent infliction of emotional distress, false

---

[17] The plaintiff claims both intentional infliction of emotional distress and the tort of outrageous conduct, but the tort of outrageous conduct is another name for the tort of intentional infliction of emotional distress, and the two terms are used interchangeably by the Kentucky courts. *See Kroger Co. v. Willgruber*, 920 S.W.2d 61 (Ky. 1996).

imprisonment, and invasion of privacy.

1.    State Tort Claims against defendants in their Individual Capacities:
      Defendants Entitled to Qualified Immunity

The defendant individuals are entitled to qualified official immunity for all tort claims brought against them.

"Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, . . . (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001) (citation omitted).  Qualified official immunity "affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Id.* at 522.

A government official did not act in "good faith" and therefore is not entitled to qualified immunity if he or she violated a clearly established right "which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position" or if he or she "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* at 523.

The plaintiff's state-law claims all arise from the allegedly unconstitutional search of Pendleton.  The plaintiff does not argue that the search was within the scope of the individuals' employment.  As discussed previously in this opinion, all of the individual defendants involved in this search were acting in a "legally uncertain environment" and did not, even under the plaintiff's facts, violate a right

31

which was clearly established as of the date of the search.  Furthermore, the plaintiff does not present evidence to support an allegation that any individual acted maliciously or with a corrupt motive.  Accordingly, the individual defendants are entitled to qualified immunity as to the state-law claims brought against them.[18]

2.    State Tort Claims against individual defendants in their Official Capacities

The claims against the individuals in their official capacities are equivalent to claims brought directly against the entities themselves. *See, e.g.*, *Yanero*, 65 S.W.3d at 521 ("[W]hen an officer or employee of a governmental agency is sued in his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled.").  The plaintiff seeks summary judgment in her favor, as do the defendants.[19]

a.    *Hardin County Board of Education Entitled to Immunity*

---

[18]The plaintiff argues that Fassett is not entitled to qualified official immunity because she testified that she did as she was told and, so the plaintiff's argument goes, was not acting within her discretion.  This argument is without merit.  *See Lamb*, 162 S.W. 3d at 909 (discussing that actions by teachers and administrators searching students are discretionary actions).

[19]There is some discussion in the depositions of the officers' status of being employees of both the City of Vine Grove Police Department and the Hardin County Board of Education.  The parties do not explore in their filings how such status might affect the liability of either the city or the board of education for the officers' actions, and the city does not argue that it should not be liable for actions taken by the officers while they performed the search at the school.  The court therefore considers the officers to be employees of the City of Vine Grove, and claims against them in their official capacities to be claims against the city.

"'Governmental immunity' is the public policy, derived from the traditional doctrine of sovereign immunity, that limits imposition of tort liability on a government agency." *Yanero*, 65 S.W.3d at 519.  Under Kentucky law, a local board of education is a governmental entity entitled to governmental immunity. *Id.* at 527; *see also Schwindel v. Meade County*, 113 S.W.3d 159 (Ky. 2003).  It is entitled to governmental immunity for any tort liability arising from actions of employees as they performed the governmental functions of the entity.  However, it can be held liable for the tortious conduct of its employees if the complained-of actions were taken pursuant to an official policy of the entity.  *Grayson County Bd. of Educ. v. Casey*, 157 S.W.3d 201, 202-03 (Ky. 2005).

There is no dispute here that the employees of the school board were engaged in actions that were within the scope of their employment and related to the BOE's governmental function.  As discussed in a previous section of this opinion, the plaintiff has not demonstrated that the complained-of actions are directly attributable to the entity because they were taken pursuant to an official policy of the BOE.  Accordingly, the BOE is entitled to immunity for any tortious acts of its employees, Fassett and Welch.

### b.    City of Vine Grove

City of Vine Grove argues that the court should grant summary judgment in its favor as to the plaintiff's claims of tort-law violation brought against it.  The defendants rely on *Monell*, 436 U.S. 658, and the principle of qualified immunity

33

for government officials performing discretionary functions for violations of constitutional law, described in, for example, *Reynolds v. City of Anchorage*, 379 F.3d 358 (6th Cir. 2004).  This reliance is misplaced.  *Monell* discusses the availability of immunity to municipalities when municipal employees are accused of constitutional law violations; qualified immunity is available to individuals, sued in their individual capacity, not to municipalities.  The court will consider other arguments made by the city in support of its motion for summary judgment on the tort claims brought against it and against Fisher and Riggs in their official capacities.

　　　　　1.　　Negligence

　　　Under Kentucky law, "the elements of a negligence action are: (1) a duty on the part of the defendant; (2) a breach of that duty; and (3) consequent injury." *Richardson*, at *9 (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992)).  The defendants argue that because the search was lawful, it did not constitute a breach of any duty owed to the plaintiff.  The plaintiff contends that because the search was in violation of the written school policy, in that the search was performed without individualized suspicion, it was negligent.  The plaintiff is apparently arguing for defendants' liability under a theory of negligence *per se*, with the school's written policy as a substitute for the general standard of care.  However, as the court has earlier discussed, searches of students without individualized suspicion may still be reasonable.

　　　As established in a previous section of this opinion, the court concludes that

34

the facts presented by the plaintiff support a finding that her constitutional right to be free from an unlawful search was violated.  However, the defendants dispute the plaintiff's facts; namely, there is a dispute as to the impetus for and the scope of the search.  This dispute is material to resolution of the negligence claims, as the plaintiff argues the city is liable because there was a constitutional violation and the city argues it is not liable because there was not a violation.  Accordingly, the court denies summary judgment as to this claim.

### 2.    Assault & Battery

The defendants argue that because the search was lawful, there was no assault and battery because there was no "unlawful touching."  They argue that there was no assault because the plaintiff has not alleged that she was put in fear of imminent battery at any point.

Under Kentucky law, the definition of a battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him."  *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000).  Although proof of the tort requires proof of intent, "it is an intent to make contact with the person, not the intent to cause harm."  *Id.*

This claim, then, also turns on whether the search was unconstitutional, and summary judgment is denied because material facts are in dispute.

### 3.    Intentional Infliction of Emotional Distress

Whether or not conduct rises to the level of "outrageous" is a question of

35

law. *See Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996). The court concludes that the conduct the plaintiff complains of is not so outrageous and extreme so as to support this claim. Accordingly, it will grant the defendants summary judgment as to this claim.

### 4. Negligent Infliction of Emotional Distress

The parties agree that the city's liability for a claim of negligent infliction of emotional distress requires a finding that the search was unlawful. As stated above, the court finds that a genuine issue of material fact exists and it cannot conclude on summary judgment that the search was unlawful. The court therefore denies the motion as to this claim.

### 5. Invasion of Privacy

Liability for intrusion of privacy requires that the intrusion be "highly offensive to a reasonable person." *See* RESTATEMENT (SECOND) OF TORTS § 652B; *see McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981) (noting that Kentucky courts rely on the Restatement in addressing invasion-of-privacy claims). There is a factual dispute as to the scope of this search; specifically, plaintiff contends she was made to bare her breasts as part of the search, while the defendants deny that allegation. The court denies summary judgment because it concludes this dispute is material to a determination of liability for this tort.

36

6.      False Imprisonment

"Kentucky cases define false imprisonment as being any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats, or otherwise. Furthermore, false imprisonment requires that the restraint be wrongful, improper or without a claim of reasonable justification, authority or privilege." *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. App. 2001).

The merits of this claim turn on whether the search was lawful; accordingly, as there is a genuine dispute as to the underlying facts, summary judgment is inappropriate.

3.      <u>Negligent Supervision Claim against City of Vine Grove and Hardin County BOE</u>

"Under Kentucky law, the two elements of a suit for negligent hiring and retention are that (1) the employer knew or reasonably should have known that the employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Richardson*, at *10 (quoting *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000)). "Public officers are responsible only for their own misfeasance and negligence and are not responsible for the negligence of those employed by them if they have employed persons of suitable skill." *Id.* (quoting *Yanero*, 65 S.W.3d at 528).  The plaintiff has made no showing that Fisher was not "of suitable skills" or

37

these defendants knew or should have known that Fisher was somehow unfit for her job.  Accordingly, the court grants the defendants summary judgment as to this claim.

### III.   CONCLUSION

In summary, based upon the foregoing discussion, all of the plaintiff's claims against the individual defendants will not proceed based upon the doctrine of qualified immunity.  Her section 1983 claims against the official defendants will not proceed because she lacks the requisite evidence.  Her state tort claims against the Hardin County BOE and BOE employees named in their official capacities will not proceed because of governmental immunity.  Her state tort claims of intentional infliction of emotional distress and negligent supervision against the City of Vine Grove will not proceed for the reasons stated.  The only claims which will proceed are the following state tort claims against the City of Vine Grove: negligence; assault and battery; negligent infliction of emotional distress; invasion of privacy; and false imprisonment.  Accordingly, it is **ORDERED** that:

(1)   the plaintiff's motion for summary judgment (R. 42) is **DENIED**;

(2)   the motion for summary judgment by defendants Hardin County Board of Education, Joe Welch, and Della Fassett (R. 47) is **GRANTED;**

(3)   the motion for summary judgment by defendants City of Vine Grove, C.J. Fisher, and Dale Riggs (R. 51) is **GRANTED in part and DENIED in**

**part**, and

(4)     the plaintiff having reached the age of majority, all further pleadings

shall be styled in the manner of this opinion, and the clerk shall make

appropriate docketing adjustments.

Signed on  September 1, 2009

*Jennifer B Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**

39